Dorothy E. Farrier, Plaintiff-Appellee, v. Pauline Galbreath Farrier, Defendant-Appellant.

Gen. No. 10,505.

Fourth District.

March 6, 1964.

Rehearing denied April 2, 1964.

Jack Austin and Ralph E. Suddes, of Mattoon (Robert H. Brunsman, of counsel), for appellant.

Kenneth A. Green, of Mattoon, for appellee.

SMITH, J.

This appeal involves the problem of piracy on the matrimonial seas. Plaintiff, an ex-wife of one, Clem C. Farrier, charged the defendant, present wife of Clem, with alienation of his affections. The trial court accepted a jury verdict of $20,000 in favor of the plaintiff, entered judgment on the verdict and denied defendant's post-trial motion for judgment notwithstanding the verdict or for a new trial or for a remittitur of $17,500. The defendant here seeks either a reversal or a remandment for new trial. The defendant says this judgment cannot stand because (a) the plaintiff neither alleged nor proved that there was any love

and affection on the part of Clem for the plaintiff which might or could have been alienated, (b) that no acts, words or conduct of the defendant induced, enticed or precipitated the flight of Clem's love and affection from the plaintiff, and (c) the verdict is far in excess of the actual damages shown by the evidence.

The undisputed chronology of plaintiff's marriage with Clem briefly follows: They were married on August 2, 1942. One daughter, Shirley, 16 years of age at the time of the suit, was the product of this union. Clem departed the family domicile on August 10, 1961 and filed his suit for divorce on September 14, 1961. Plaintiff counterclaimed charging cruelty and was granted a divorce on her counterclaim on March 31, 1962. The divorce decree awarded her custody of Shirley, possession of the jointly owned home, possession of the furniture and directed that Clem pay her $50 per month alimony, $50 per month child support, $76 per month on the mortgage existing on the home, and that he pay all utilities except the telephone. Clem's take-home pay from two jobs was about $415. Since 1952 he was employed by the Central Illinois Railroad and the U. S. Grant Hotel. The railroad job apparently required 8 hours per day, five days a week, and the hotel job 8 hours per day, six days a week. The family had lived in a $12,500 home for about six years upon which the mortgage balance approximated $8,525. Clem married the defendant on April 22, 1962, 22 days after the divorce. Plaintiff filed the instant suit on May 11, 1962, 19 days after Clem's second marriage.

■ Our review of this case must be continually kept in focus with the declared public policy of this State that the damages "shall be limited to the actual damages sustained"; that "no punitive, exemplary, vindictive or aggravated damages shall be allowed,"

and that any "punishment of wrongdoers guilty of alienation of affections" shall be left to the criminal laws of the state. Ill Rev Stats (1961), c 68, § 34 et seq. To sustain a cause of action plaintiff must allege and prove (a) love and affection of the spouse for the plaintiff, (b) overt acts, conduct or enticement on the part of the defendant causing those affections to depart and (c) actual damages. It was early stated in Bassett v. Bassett, 20 Ill App 543, 550 that:

> "Marriage, of itself, cannot be considered as conclusive proof of that mutual regard and love which should be entertained by husband and wife, and where one of them seeks to recover damages for the loss of love and affection, we know of no case that goes so far as to deprive the defendant of the right of showing the real feelings of the other to the plaintiff."

Current literature on the subject suggests that the truth of the first portion of this statement has not diminished with the passage of time.

We now turn to the evidence to ascertain, if we can, the locale of Clem's love and affection. That they had departed the family domicile before his physical departure on August 10, 1961 is not a matter of dispute. Nautically speaking, we must determine whether they just drifted away, whether Clem voluntarily floated them away or whether the defendant pirated them away. The liability of the defendant must rest on the last of the three alternatives.

The atmosphere of the home is in sharp dispute. Plaintiff, her sister, the daughter and the mother-in-law testified to a commonplace, normal love and affections and relatively uneventful family existence. Clem characterized the life as devoid of affection for almost five years, little family conversation, few family pleasures or entertainment together, a lack of sexual

relations for almost five years, a circumstance which the plaintiff denied, and no display of normal affections in the family. The true atmosphere of this family is thus characteristically a jury question.

■ The trial court sustained objections to testimony of defense witnesses of Clem's relationship with other women, some 5 or 6 in number, extending over a period of five years and that these women would come to the railroad station and Clem would change clothes and depart with them from time to time. An offer of proof was denied. Statements made by Clem to these witnesses that he was unhappy with his married life and that on one occasion he stated that he remained only for the sake of the daughter and would leave when she became of age were likewise excluded. We think the trial court was in error in excluding this testimony and that the jury should have been permitted to consider this testimony not as a part of the res gestae but as an exception to the hearsay rule.

The Court in Dunn v. Dunn, 241 Ill App 11 at 18–19, said:

> "Appellant's counsel has cited many cases on the subject of hearsay which are entirely inapplicable. . . . Jones, Commentaries on Evidence, Vol 2 Sec 350. The author continues: 'That where emotions, feelings or *state of mind* of third parties are to be proved, the Courts often permit their declarations as original evidence, although such statements have many of the elements of hearsay. This has often been illustrated in actions for the alienation of wife's affections, and in other actions where state of feeling has been relevant.' Many cases are there cited in support of the rule."

In Fox v. Fuchs, 241 Ill App 242, 262 the Court said:

"Testimony of the defendant, or other witnesses as to statements of the alienated husband, showing the state of his affections, his motive or reason for separating from the plaintiff, or the effect of the plaintiff's actions upon him, is admissible."

The general rule is stated in 27 Am Jur Husband and Wife, Par 560 as follows:

"Evidence of the conduct or declarations of the plaintiff's spouse is admissible in behalf of the defendant to show the state of mind of such spouse and, thereby, that there was no loss of affections procured, brought about, or solicited by the defendant but that the loss of affections, if any, resulted from some other cause. . . ."

The excluded testimony, if believed by a jury, suggests that Clem's affections were not safely moored to the home dock, that they had strayed from time to time and that these excursions as well as the one with the defendant may have been self-planned, instituted and consummated by Clem—he may well have been pursuer rather than the pursued. From the circumstances of their visits to him at the station a jury might also well have concluded that these other ladies were the pursuers and Clem was the pursued. These considerations have a bearing upon the quality, the quantity and the texture of his affections for the plaintiff as well as a background for the effect of defendant's conduct on him and on the question of causation.

Turning now to the defendant, Clem's acquaintance with her began in 1952 when he started to work at the hotel. Defendant's husband was manager of the hotel and she was the dining room hostess. Her husband died in 1955 and she discontinued work for about three years, returning to the hotel about 1958. The

476

record is barren of any fact or circumstances concerning this acquaintanceship until July 7, 1961. On cross-examination, defendant testified that "during all the time he was around the hotel he was a gentleman." She further stated without objection that the first time he discussed his family life was on August 11th or 12th. As abstracted, she said "Clem told me he had been very unhappy and dissatisfied at home for a long time and I said, 'Clem, for the sake of the girl stay with Dorothy; it's perfectly all right with me.' He told me the only reason he had stayed as long as he had was because of the little girl." Defendant stated that Clem picked her up about 8:30 p. m. They went to Sullivan for a cup of coffee, returned to Mattoon and he went immediately to work. She saw him once a week thereafter in the evenings on Tuesday or Wednesday when Clem had to go to work at 10 p. m. They usually went to Sullivan or Charleston or to some local place for a cup of coffee. She gave him a couple of shirts for Christmas 1961 and knew that he was a married man.

A detective employed by the plaintiff through her attorney testified that on September 2, 1961, Clem left work about 6 p. m. and drove to his place of residence. Defendant came for him in her car, they returned to her home, remained until about 9:30 p. m. and then left in her car. On September 4 about 10:30 p. m. Clem drove to Mel's Restaurant in his car. They had lunch together. She returned to her car. They chatted through the window. He leaned down and kissed her. Both then went their separate ways.

The daughter, Shirley, testified that she had seen her father in the car with the defendant several times—place and dates vague. That on August 8, she, her mother and a Mrs. Giberson drove to defendant's house and found Clem's car parked in the rear. Her father was on the porch. Shirley tried to get in but

477

the screen door was locked. She saw the defendant in the house dressed in a "flimsy negligee. It was pale blue and very mist-like and it went to the floor and it was very soft." Both Clem and the defendant deny this. Defendant went to another part of the house and later came out dressed "in a small elastic halter, strapless, and a long summer cotton skirt." Defendant ordered the witness and her mother off the place. Clem and his family returned home and Clem left. He testified that he slept in the baggage room at the station that night. On August 9, plaintiff, her sister and Shirley were out driving. They saw Clem's car parked on the street and they pushed it to a filling station about a block away. Neither Clem nor the defendant was there. Clem came up in a police car. He and plaintiff had some words and she slapped him. He got in his car and drove away. Later that evening they saw Clem and the defendant in a car together. Clem came on August 10 with a policeman, took his belongings and left the home for good.

The rules governing the conduct of the defendant were stated in Smith v. Gillapp, 123 Ill App 121 @ 124 as follows:

> "It is not enough in such a case to prove the fact of appellee's husband being infatuated with appellant, and that in consequence thereof his affections for his wife had grown cold, but it is necessary to show that the person who is charged with wrong was the blamable party, and that she by some act or words had wrongfully and willfully sought to draw the affections of appellee's husband from appellee to herself, and had succeeded in doing so."

Both parties place strong reliance on this case. Its principles were approved in Murphy v. Willumsen, 224 Ill App 425 at 428. Plaintiff's position can be

summarized by a single sentence in her brief where she says: "As shown by the evidence in this case . . . Farrier was a devoted husband until the defendant enticed him with her negligee, her frequent changes of clothing while he was around, her strapless halters and her calling upon him with her automobile."

It is no evidence of sagacity on the part of this court to observe that the sacredness of the family relationship needs whatever protection it can get in modern America. The conduct of Clem and the defendant can scarcely be characterized as a model of exemplary conduct. In referring to the negligee-halter episode, the plaintiff says "obvious seduction . . . obvious enticement . . . obvious alienation." We are unable to ascribe to these garments per se the iniquitous purposes which plaintiff ascribes to them. We think we have, with some degree of judicial modesty, observed that other feminine apparel of like revealing rather than concealing texture and structure have become somewhat commonplace in the modern market place and salon. We dare not indict their wearers with the same iniquitous purpose which the plaintiff lays at the door of this defendant.

We must look to the purpose and the intent of the defendant to fix a civil liability, and to stamp her as the blamable party. The literature of all countries in all languages and in all civilizations since the Garden of Eden is replete with the lures, the enticements, the inducements and the temptations used by womankind to lead, control, direct, influence and, indeed, to confound man. Their use has not been either universally malignant or universally benign. It is the purpose and the intent with which they are used that characterizes them as within the one or the other.

Plaintiff relies on Smith v. Gillapp, supra and quotes the following language:

"It was incumbent upon the plaintiff to prove that the defendant was blamable for the plaintiff's husband's infatuation; unless the defendant did or said something with a willful and wrongful intent to engage his affections and thereby to seduce him from his fidelity to his wife, and unless she was successful in this evil purpose she is not liable. The law imputes to her no evil because of her attractiveness, nor because she may have been pleased with the admiration of the plaintiff's husband."

We search in vain in this record for any act or word of the defendant which affirmatively initiated, induced, enticed or purloined the love and affections of Clem from the plaintiff to the defendant. We think it clear that she was the passive rather than the active party. She was the pursued rather than the pursuer. She was the hunted rather than the hunter. If it were otherwise this record fails to show it. The defendant interposed no objection when Clem sought a reconciliation with his wife through Rev. Dees. The plaintiff herself testifed that Clem called several times and that he said "Pauline would let him come back." She further testified, "I refused to let him come back in September 1961." It would extend this opinion to undue lengths to discuss the cases in this and other jurisdictions where recovery has been allowed. Suffice it to say that the record in this case falls far short of the factual foundation for recovery disclosed by them. There is a total want of evil conduct, acts, words, inducements or enticement usually characterizing these cases and suggesting a willful and wrongful intention to pirate Clem's affections.

In Murphy v. Willumsen, 224 Ill App 425, at 428 the Court said:

"The rule is that before a defendant can answer for damages in such an action, it must be proven

480

that she was blamable and that what she did to alienate the husband's affections must have been with a willful and wrongful intent."

■ Whether or not all of the evidence in the record, together with all of the inferences that may legitimately be drawn therefrom, considered in all its aspects most favorable to the plaintiff, shows a total failure or lack of evidence to prove a necessary element of the plaintiff's case presents a question of law for the Court. Finley v. New York Cent. R. Co., 19 Ill2d 428, 167 NE2d 212; Lessen v. Allison, 25 Ill App2d 395, 166 NE2d 806. We think this evidence fails either to show a willful or wrongful intention or design on the part of this defendant to alienate the affections of Clem from his wife or that any act, words or conduct of hers was the proximate cause of their departure—there being a total lack of proof of these necessary elements, the judgment of the City Court of Mattoon must be and it is hereby reversed.

Reversed.

CROW, P. J. and SPIVEY, J., concur.